Case 1:15-cv-00322-WS-N   Document 81   Filed 01/18/17   Page 1 of 15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| KATHERINE WHITE, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION 15-322-WS-N |
| | ) |
| THE NIF CORPORATION, etc., | ) |
| | ) |
|     Defendant. | ) |

## ORDER

This matter is before the Court on the plaintiffs' motion for partial summary judgment. (Doc. 67). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 66, 67, 69, 70, 73), and the motion is ripe for resolution. After careful consideration, the Court concludes the motion is due to be granted in part and denied in part.

## BACKGROUND

This is a collective action to recover amounts allegedly due the original plaintiff and seven opt-in plaintiffs (collectively, "the plaintiffs") under the Fair Labor Standards Act ("FLSA"). According to the complaint, (Doc. 1), the plaintiffs were employed by the defendant as servers at its Spanish Fort restaurant. As relevant to the instant motion, the complaint alleges that the defendant: (1) failed to pay the plaintiffs for all hours worked; and (2) failed to pay the plaintiffs the minimum wage for substantial non-tipped work. On the instant motion, various subsets of the plaintiffs seek partial summary judgment as to specific dates and hours, resulting in specific monetary awards, plus an equal amount as liquidated damages.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.*; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving

party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[1]  Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited.  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

**I. Uncompensated Hours.**

The parties agree that employees clock in and out using a point-of sale ("POS") system with individually assigned code numbers.  The parties agree that

---

[1] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").  "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs," and "[l]ikewise, district court judges are not required to ferret out delectable facts buried in a massive record …." *Chavez v. Secretary, Florida Department of Corrections*, 647 F.3d 1057, 1061 (11th Cir. 2011) (internal quotes omitted).

an employee's time can be reflected in up to four sets of records: (1) attendance reports ("Focus Attendance Reports"), which are generated directly from the POS system; (2) internal reports ("Internal Payroll Reports") created by the defendant, which the defendant admits are supposed to match exactly the hours reflected on the Focus Attendance Reports; (3) worksheets ("Payroll Worksheets"), which are blank forms completed by hand by the defendant's representatives from the Focus Attendance Reports and/or Internal Payroll Reports and sent to the defendant's payroll outsourcing company ("APS") for its use in completing the defendant's weekly payroll; and (4) reports ("Payroll Registers") prepared by APS and reflecting the number of hours for which the employee was paid for the workweek. (Doc. 66-5 at 36-38; Doc. 67 at 10-11; Doc. 69 at 6-7).

The defendant has not maintained a complete set of either the Focus Attendance Reports or the Internal Payroll Reports. However, because the latter are intended by the defendant to reflect exactly the former, the plaintiffs may, and do, rely on the latter when the former are missing. (Doc. 66-12 at 3; Doc. 67 at 12 n.5; Doc. 69 at 7).

The plaintiffs identify two ways in which the defendant failed to compensate them for all worked hours. In the first, the defendant edited the Focus Attendance Reports to delete time entries, resulting in the affected plaintiff receiving no pay for the deleted hours. In the second, the Focus Attendance Reports were not edited but the affected plaintiff nevertheless received pay for fewer hours than reflected on the Focus Attendance Reports or Internal Payroll Reports. The plaintiffs identify eight specific instances of the former circumstance and nine specific instances of the latter. The Court has reviewed the documents on which the plaintiffs rely and has confirmed both that the discrepancies exist and that they exist in the precise amounts asserted by the plaintiffs.

The defendant neither denies the discrepancies nor quarrels with the plaintiffs' mathematical calculations. Instead, the defendant asserts that "the

4

unedited Focus Attendance Reports and Internal Payroll Reports are unreliable as records of actual hours worked by Plaintiffs." (Doc. 69 at 10).

An FLSA plaintiff "has the burden of proving that he performed work for which he was not properly compensated. … When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). The defendant's evidence of unreliability, (Doc. 69 at 10-12), is far too feeble to prevent the plaintiffs from proving the fact and quantity of uncompensated hours from the defendant's own records.

The defendant stresses that employees have been known to forget to clock out, resulting in the unedited Focus Attendance Reports crediting them with working all the way through to their next shift, thereby crediting them with workdays of up to 20 hours; plaintiff White even testified this had happened with her. The problem, of course, is that none of the seventeen specific instances at issue on this motion involve such an extreme situation with such a radical reduction of recorded hours; that such lengthy forgetfulness may have occurred at other times is irrelevant.

The defendant also stresses that employees have on occasion forgotten to clock out but have quickly notified management so that the correct hours can be paid; White again testified that she had done so. Such circumstances might explain why some entries in the Focus Attendance Reports are edited to reduce the reported time but, again, none of the eight specific instances of editing at issue on this motion involve such a situation. The only edits to the Focus Attendance Reports at issue herein involve the complete deletion of entire work shifts, something that cannot be explained as a response to an employee forgetting to clock out at the end of her shift.

As to the nine other specific instances of reduced hours, adjustments for employee forgetfulness theoretically could explain the discrepancy between the Focus Attendance Reports or Internal Payroll Reports and the Payroll Registers.

The defendant, however, has presented no evidence that any of the nine specific discrepancies at issue on this motion resulted from such an adjustment.  There are eight plaintiffs in this action and, over the course of the two-year period covered by the motion, they (and their predecessors and/or successors) worked approximately 800 workweeks.[2]  The defendant repeatedly concedes that editing of employee time occurred only "occasionally," (Doc. 79 at 11-12), and it has done nothing to suggest that such editing occurred on the nine specific workweeks (1.1% of the total) as to which summary judgment is sought.

The defendant next relies on hearsay evidence that plaintiff Stuchman persuaded a manager to roll back her time so that she would stay under 40 hours, thereby permitting her to remain at the restaurant and continue earning tips.  The only two workweeks as to which Stuchman seeks summary judgment, however, involve reductions of her workweek time from 27.84 hours to 20.77 hours and from 4.80 hours to 3.55 hours.  (Doc. 67 at 13-14).  Neither remotely implicates an employee request to avoid exceeding 40 hours.  Nor has the defendant offered any evidence (or argument) that any other plaintiff engaged in similar activity.

Finally, the defendant insists that there "could be" explanations why a worker should not be compensated for a shift completely deleted from the Focus Attendance Reports.  (Doc. 69 at 12).  The defendant, however, offers no such explanation and no evidence to suggest any such explanation is more than hypothetical, much less enough evidence to show that the explanation applies to any of the eight specific workweeks at issue.

At bottom, the best the defendant can muster is a vague suggestion – unsupported by any authority – that, because some time errors as to some employees have or may have occurred in the past, the plaintiffs cannot use the defendant's own records to show the hours they worked.  Theoretical or irrelevant imperfection, however, does not render an employer's records inaccurate under

---

[2] Eight servers working 50 weeks a year equals 400 workweeks.

*Anderson*, and the defendant has done nothing to support an inference that the seventeen specific workweeks at issue are tainted by any flaw whatsoever.

In summary, under the evidence and argument presented, the defendant has kept proper and accurate records of the time worked by the affected plaintiffs during the seventeen specific workweeks at issue on the instant motion. Those records reflect that, as to the seventeen workweeks made the subject of the instant motion, there is no genuine issue of disputed fact as to the number of hours the affected plaintiffs worked or the number of hours for which they were paid.

**II. Non-Tipped Work.**

The plaintiffs are all servers, and the defendant has claimed a tip credit for all hours worked by them. The plaintiffs note that there are limits to an employer's right to claim such a credit, and they seek partial summary judgment as to what they believe are egregious examples of the defendant's overreaching.

The Department of Labor has by regulation prohibited the taking of a tip credit when the employee is effectively employed in two occupations, as to only one of which the employee is a tipped employee (such as a maintenance person also serving as a waiter); in such a situation, the employer can take the tip credit only with respect to the employee's employment as a waiter. 29 C.F.R. § 531.56(e). The provision distinguishes this "dual occupation" situation "from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses"; in the latter situation, "[s]uch related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips." *Id*.

As noted by the Eighth Circuit, the regulation's failure to more precisely define "related duties" or "part of the time" renders the regulation ambiguous as to when an employer may take a tip credit for time spent by a tipped employee on related duties that do not themselves produce tips. *Fast v. Applebee's International, Inc.*, 638 F.3d 872, 877, 880 (8th Cir. 2011). According to the

7

Department of Labor's handbook, "where the facts indicate that specific employees are routinely assigned to maintenance, or that tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties." *Id*. at 877-78 (internal quotes omitted). The Eighth Circuit has upheld the handbook elaboration as a "reasonable interpretation of the regulation." *Id*. at 880. Multiple district courts within the Eleventh Circuit agree. *Ash v. Sambodromo, LLC*, 676 F. Supp. 2d 1360, 1367 (S.D. Fla. 2009); *Ide v. Neighborhood Restaurant Partners, LLC*, 2015 WL 11899143 at *6 (N.D. Ga. 2015); *Crate v. Q's Restaurant Group LLC*, 2014 WL 10556347 at *3 (M.D. Fla. 2014); *Holder v. MJDE Venture, LLC*, 2009 WL 4641757 at *3 (N.D. Ga. 2009).[3] For reasons set forth in these cases, and especially in *Fast*, the Court finds this approach persuasive.

    The plaintiffs argue that the defendant improperly took a tip credit for time they spent before the restaurant opened, during which they performed such tasks as food preparation, janitorial activities and attending meetings with managers. On the instant motion, they limit their focus to workweeks in which these pre-opening activities accounted for more than 20% of their workweek. (Doc. 67 at 22-25, 29-31). The Court has reviewed the plaintiffs' evidence and concurs that, if the 20% rule applies, the affected plaintiffs are entitled to the full minimum wage for such activities during 62 workweeks.[4]

---

[3] The plaintiffs also cite a wealth of cases from other jurisdictions embracing the 20% rule. (Doc. 73 at 16).

[4] As to plaintiff Stewart, the plaintiffs have sought the full minimum wage for two workweeks in which her work time prior to the restaurant's opening amounted to less than 20% of her total hours for that workweek. (Doc. 66-12 at 8-9). Those workweeks must be excluded from any award.

The defendant, however, resists application of the 20% rule. According to the defendant, the Eleventh Circuit has rejected the 20% rule in a decision that is "binding upon this Court." (Doc. 69 at 19). The Court cannot agree.[5]

The defendant relies on *Pellon v. Business Representation International, Inc.*, 291 Fed. Appx. 310 (11th Cir. 2008) ("*Pellon II*"). The panel affirmed the grant of summary judgment by the lower court ("*Pellon I*")[6] and did so "on the basis of the district court's well-reasoned order." *Id*. at 311. The defendant concludes that this language renders *Pellon I* controlling Eleventh Circuit precedent.

The defendant assumes that an affirmance *based on* a district court's order is the same thing as the *adoption* of the district court's order as the appellate court's own, but it offers no authority supporting its position, which is debatable at best. *See Grover Piston Ring Co. v. United States*, 752 F.2d 626, 626 n.1 (Fed. Cir. 1985) ("'[O]n the basis of' does not mean we adopt the Court of International Trade's memorandum as binding precedent."); *accord Principal Mutual Life Insurance Co. v. United States*, 50 F.3d 1021, 1025 (Fed. Cir. 1995); *see also Schamis v. Josef's Table, LLC*, 2014 WL 1463494 at *4 n.2 (S.D. Fla. 2014) ("While the Eleventh Circuit affirmed *Pellon* [*I*], it did not affirmatively state it rejected the 20% guidance.").

Even could these very different concepts be treated as identical, *Pellon II* is unpublished. "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Construction, Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007). Thus, *Pellon I* cannot possibly be binding on the Court even if *Pellon II* adopted it as its

---

[5] The defendant dedicates a substantial portion of its briefing to demonstrating that the plaintiffs' pre-opening duties do not qualify as a second, non-tipped job under the "dual occupation" regulation. Because the plaintiffs do not rely on the dual occupation principle, the Court need not consider the defendant's presentation in this regard.

[6] *Pellon v. Business Representation International, Inc.*, 528 F. Supp. 2d 1306 (S.D. Fla. 2007).

own opinion. The only question is whether *Pellon I* is sufficiently persuasive to entice the Court to abandon the many cases upholding the 20% rule. It is not.

The reality is that *Pellon I* did not reject the 20% rule and certainly did not do so in circumstances resembling those of this case. In *Pellon I*, the plaintiff skycaps claimed that their non-tipped duties were performed "throughout the day" and were thus "intertwined with direct tip-producing tasks." 528 F. Supp. 2d at 1313. The *Pellon I* Court considered utilization of a 20% rule "infeasible" in such a situation, as it would be "impracticable or impossible" to make such a calculation "minute by minute." *Id*. at 1313-14. Moreover, the "overwhelming majority" of tasks on which the plaintiffs relied did not constitute "general preparation work or maintenance" and thus could not be counted towards a 20% threshold in any event, rendering a "determination" of the 20% rule's viability "unnecessary under these facts." *Id*. at 1314. As a sister court has stated, "[g]iven that the *Pellon* court was not required to determine the amount of deference to be given to the 20% rule, this Court finds Defendant's reliance on *Pellon* to be misplaced." *Crate*, 2014 WL 10556347 at *3; *accord Knox v. Jones Group*, ___ F.Supp. 3d ___, 2016 WL 4371630 at *6 n.5 (S.D. Ind. 2016); *Irvine v. Destination Wild Dunes Management, Inc*., 106 F. Supp. 3d 729, 734 (D.S.C. 2015); *Flood v. Carlson Restaurants Inc*., 94 F. Supp. 3d 572, 582 n.7 (S.D.N.Y. 2015).

The defendant suggests that, even if *Pellon I* did not directly reject the 20% rule, it identified a "slippery slope" problem with the rule that can be avoided only by rejecting the rule across the board. (Doc. 69 at 22-23). The instant motion, however, is being played out on flat, dry terrain; there is no danger here of becoming entangled in "minute by minute" examinations of whether a plaintiff was engaged in tip-producing activity versus related, non-tip-producing activity to be credited towards the 20% threshold. This is so because the plaintiffs rely only on their hours worked before the restaurant opened – time that could not generate tips because there were no customers to provide them. The Court agrees with the

10

*Crate* Court that, "to the extent that there are discrete time periods – such as before the restaurant opens to customers, after the restaurant is closed to customers, or between the lunch and dinner shifts – during which the Plaintiffs can show that they were engaged in related, non-tipped activities, such could be used as evidence to support their claim that they spent more than 20% of their shifts doing related, non-tipped work for which Defendant is not entitled to the tip credit." 2014 WL 10556347 at *4. Whether the plaintiffs could also rely on short periods of related, non-tip-producing activity interspersed with tip-producing activity is not a question that must presently be answered.

Finally, the defendant repairs to its earlier argument that its time records are unreliable, thereby precluding the plaintiffs from showing that they satisfy the 20% rule. (Doc. 69 at 23). This argument fails for reasons expressed in Part I.

### III.  Damages.

As discussed in Part I, as to the seventeen workweeks made the subject of the instant motion, there is no genuine issue of disputed fact as to the number of hours the affected plaintiffs worked or the number of hours for which they were paid. Those figures, with respect to reduced hours, are as follows:

| Plaintiff | Hours Worked but Unpaid |
|---|---|
| Brentzel | 12.0 |
| McGuff | 7.4 |
| Stuchman | 8.32 |
| White | 33.99 |
| Stewart | 16.24 |

Those figures, with respect to deleted hours, are as follows:

| Plaintiff | Hours Worked but Unpaid |
|---|---|
| Brentzel | 5.83 |
| McGuff | 25.18 |
| Stewart | 16.58 |

11

    Purdy                    5.68[7]

    The plaintiffs seek a money judgment as to these hours, but the figures they offer are not supported by the record.  The plaintiffs were servers, and they have not attempted to show that their regular hourly rate for the hours at issue was or should be more than $2.13 or that their overtime hourly rate for the hours at issue was or should be more than half again as much.  The blended hourly rates they propose, however, range from a low of $7.25 to a high of almost $60. (Doc. 67 at 16, 19).[8]  In light of this gross and unexplained discrepancy, the Court can make no award of damages on the instant motion.

    As discussed in Part II, as to 62 of the 64 workweeks as to which summary judgment is sought, the affected plaintiff spent more than 20% of her total workweek hours performing non-tip-producing duties prior to the restaurant's opening.  The total number of hours as to which the defendant may have underpaid a plaintiff on this basis are as follows:

| Plaintiff | Hours Worked Prior to Opening |
|---|---|
| White | 6.55 |
| Stewart | 333.04 |

    As to these hours, the affected plaintiffs are entitled to be paid the full minimum wage of $7.25.  The plaintiffs ask the Court to assume that, for each of these hours, the affected plaintiffs were actually paid only $2.13, but they offer no evidence from which the Court could draw this conclusion.  On the contrary, the plaintiffs have submitted pages from the Payroll Registers reflecting that various plaintiffs were at times paid more than $2.13 per hour. (Doc. 66-9 at 4, 12, 13 (showing plaintiff Stuchman being paid at $10.00 per hour and plaintiff White being paid at $8.00 and $5.00 per hour)).  Without clear evidence of the hourly

---

    [7] As noted in Part I, the defendant has raised no challenge to these calculations.
    [8] For example, the plaintiffs seek an award of $440.56 for the 7.4 hours for which McGuff was not paid, (Doc. 67 at 16), which works out to about $59.54 an hour.  Other proposed hourly rates include, approximately, $40.68, $39.22, $33.50, $30.10, $22.16, $21.98, $12.74, and $7.25.

12

rate already paid the affected plaintiffs for the hours at issue, the Court cannot make an award of damages on this motion.

## IV. Liquidated Damages.

"Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Because, as discussed in Parts I-III, the defendant is liable to the affected plaintiffs for unpaid minimum wages and/or overtime, the defendant is exposed to an equal award of liquidated damages. However,

> if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

*Id.* § 260. "The employer bears the burden of establishing both the subjective and objective components of that good faith defense against liquidated damages." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 (11th Cir. 2008). The plaintiffs assert that the defendant cannot meet this burden, such that an award of double damages is mandatory. (Doc. 67 at 33-35).

The plaintiffs cite *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464 (5th Cir. 1979), for the proposition that "[a]pathetic ignorance is never the basis of a reasonable belief" and that the objective component of the defense thus "requires some duty to investigate potential liability under the FLSA." *Id*. at 469. They argue the defendant did not fulfill its duty to investigate because it relied on APS to ensure its compliance with the FLSA, even though that entity had "no obligation to ensure such compliance." (Doc. 67 at 35). The plaintiffs also complain that, after a Department of Labor audit several years ago mentioned an

13

employee's assertion that the defendant "rolls time back so servers cannot get paid overtime," (*id*. at 20), the defendant "utterly failed to take steps to inquire into and or correct any problems which may have arisen under the FLSA." (*Id*. at 35).

As to their first allegation, the evidence cited by the plaintiffs does not establish that the defendant relied exclusively on APS for FLSA compliance. Having an "expectation that [APS] will keep you in compliance with … payroll laws," (Doc. 66-3 at 20), is not an admission that no other steps were taken to investigate such obligations. On the contrary, the plaintiffs concede that the same deponent testified to having conducted online research regarding such obligations and having discussed them with the Department of Labor investigator. (Doc. 67 at 21). They also submit evidence that the restaurant's owner "keeps up with the labor laws so that he can stay in compliance." (Doc. 66-10 at 19). The plaintiffs stress that there was no formal agreement for APS to ensure FLSA compliance and that APS did not understand it was its job to ensure such compliance, (Doc. 67 at 20-21), but they also cite testimony that APS did in fact catch and correct potential FLSA violations. (Doc. 66-5 at 31-32). The plaintiffs' thin briefing includes no authority holding that liquidated damages are mandatory under such circumstances.

As to their second allegation, the plaintiffs ignore the Department of Labor's finding that the single complaining party's allegations "were unsubstantiated. Through careful examinations of records all hours were paid according to FLSA's requirements and no other sever [sic] that was interviewed collaborated with [sic] allegation. Some servers kept their on [sic] time and stated that time reported is accurate." (Doc. 66-10 at 17). In sum, "[n]o Violations were found all employees who earned overtime was [sic] paid time and ½ per FLSA, employer in compliance." (*Id*. at 18). The plaintiffs do not attempt to explain why an employer found to be in compliance with the FLSA must take steps to correct the non-existent violations or be automatically subject to liquidated damages for future violations.

## CONCLUSION

For the reasons set forth above, the plaintiffs' motion for partial summary judgment is **granted** with respect to hours of uncompensated work and improper tip credit as addressed in Parts I, II and III and is otherwise **denied**.[9]

DONE and ORDERED this 18th day of January, 2017.

                                             s/ WILLIAM H. STEELE
                                             CHIEF UNITED STATES DISTRICT JUDGE

---

[9] Specifically, the motion is denied as to two workweeks for which plaintiff Stewart seeks compensation under Part II; any award of damages under Part III; and any award of liquidated damages under Part IV.